Dear Representative Kelly:
Recently you questioned the propriety of the use of merit system employees and of state property for the purposes of announcing candidacies for political office. We note that your opinion request provided very little factual information. Therefore, we inquired further of the Office of Administration as to the attendant circumstances which may have given rise to your inquiry.
The Office of Administration advised that the use of the front of the State Capitol Building and the use of the rotunda at the same time in the event of inclement weather had been reserved by a farm organization featuring the Reverend Jesse Jackson as speaker on February 11, 1986. After the Office of Administration received that request, U.S. Senatorial candidate Christopher S. Bond requested the use of the rotunda at the State Capitol Building at approximately the same time on the same day for his campaign announcement and speech on public issues. The Office of Administration asked Mr. Bond to use the Truman Building and principally the atrium area on the fourth floor. The atrium area, as well as the rotunda in the Capitol Building, are state-owned property and areas which are commonly open to the public. In the case of the farm rally with Reverend Jackson the Office of Administration, Division of Design and Construction, used its employees to set up the lectern and sound equipment. The same division of the Office of Administration set up the lectern and sound equipment for the Bond announcement and speech. As with the farm supporters the Bond supporters supplied banners and balloons for the occasion. Both events were open to the public and the farm supporters supplied anti-presidential banners and political paraphernalia.
Just as the Bond group had political figures on the podium, the farm rally group along with Jesse Jackson who has been a candidate for national office had on the podium three Democratic congressional candidates, one representative of an unannounced Democratic candidate for U.S. Senator, and an unannounced Democratic U.S. senatorial candidate.
In both instances merit employees from the Office of Administration controlled the crowd and set up lecterns and sound systems compatible with the state electrical system and maintained the state property. And in both cases the purpose of using these employees was to avoid damage to state property and maintain a reasonable control over the activities, as well as generally maintaining state property. In both cases the purposes of the activities were public.
The Office of Administration further advises that neither the farm/Jackson rally nor the Bond group used state merit system employees for any campaign purposes. The Office of Administration said that the services for both groups were normal services involved with announcements and appearances of political candidates regardless of their political party such as in the case of John Glenn who was candidate for President of the United States, other congressional candidates and gubernatorial candidates who have appeared on public property in the state of Missouri in areas that are open to public access. The Office of Administration instructed its employees to perform the functions of maintaining state property by setting up the lecterns and sound system, controlling crowds and cleaning up afterwards in the ordinary course of their duties as employees of the state of Missouri. Obviously the purpose was to place reasonable restrictions for the use and maintenance of public property in areas open to the public.
The matter of use of public facilities has already been addressed in 1 CSR 30-4.020(5).
 Public use of public areas of state facilities is appropriate. Such use shall be carefully considered to insure that it does not interfere with the required functions and activities of the department/agency occupying a facility. However, cooperation with other governmental agencies for use of space, at times when it is not required for functions of the department/agency, is in the public interests. This cooperative effort improves facility utilization and overall cost effectiveness of state maintenance and operation expenditures. Public use (other than use by governmental agencies) of some state facilities, for public functions, may also be in the public interest. This is particularly true when other suitable facilities are not available in the community. The cost of non-official public functions cannot be supported with state appropriations. When such non-official public use occurs, the direct costs for utilities and security or other personnel will be computed and recovered from the using organization. Monies received for these direct costs shall be deposited and controlled in accordance with current statutes. Records shall be maintained for all such non-official public use. The records shall include date and time of use, organization, hourly rate and total amount collected and the date of transmittal for deposit. Transmittal for deposit shall be to the treasurer of the state of Missouri, unless statutory authority provides for other deposit designation and/or control for such collections.
Thus the Office of Administration had already in place an established policy of allowing speaking functions or what is characterized in the regulation as "public use" in defined public areas with reasonable restrictions.
As to the guiding legal principles, the U.S. Supreme Court has continually reminded that: ". . . political belief and association constitute the core of those activities protected by the First Amendment. The First Amendment of the United States Constitution protects political associations, as well as political expression. The cases from the United States Supreme Court reflect a long-standing principle of a national commitment to the principle that debate on public issues should be uninhibited, robust and wide open." Elrodv. Burns, 427 U.S. 347, 356, 357, 49 L.Ed.2d, 547,96 S. Ct. 2673 (1976).
"In a Republic where the people are sovereign the ability of the citizenry to make informed choices among candidates for office is essential for the identities of those who are elected will inevitably shape the course that we follow as a nation." See Buckley v. Valeo, 424 U.S. 1, 14, 15,466 L.Ed.2d, 659, 96 S. Ct. 612 (1976) also Monitor Patriot Co.v. Roy, 401 U.S. 265, 272, 28 L.Ed.2d, 35, 91 S. Ct., 621
(1971).
"(I)t can hardly be doubted that the constitutional guarantee has its fullest and most urgent application precisely to the conduct of campaigns for political office."See Buckley v. Valeo and Monitor v. Roy, supra.
Quite obviously the constitutional right provided in theFirst Amendment of free speech touching on political issues is a protected right. The above activities appear not only to be protected constitutionally but also to be considered within the definition of public purpose wherein the use of state property must be directed for a public purpose.
Your questions raise issues concerning denial of access or perhaps begs the question of whether a state may reasonably restrict access to public properties in areas open to public use generally. The use of state employees by the Office of Administration to set up lecterns and sound systems, control traffic and to clean up after such activities appear to be reasonable restrictions as recognized by the United States Supreme Court in the course of the state maintaining proper control over its property. Otherwise as a practical matter an event which is permissible by law and protected by the United States Constitution may result in chaos and even damage to or destruction of public property.
Your final question related to whether costs should be reimbursed as a matter of regulation or legislation within the guidelines of reasonableness as set out by the United States Supreme Court. As cited above, 1 CSR 30-4.020(5) addresses the issue of costs. We would point out however that our discussions with the Office of Administration reveal that costs have never been considered to be recovered whether it involved John Glenn, Jesse Jackson, gubernatorial debates in 1984 involving politicians from both major political parties or otherwise. The regulations certainly provide for recovery of costs pertaining to non-official public use. We recommend to the Commissioner of Administration that he take a very close look at the regulation and its enforcement despite the fact that it has been represented to us that the costs involved in the public use of the state facilities by the farm rally, the Bond rally, and other previous groups have been nominal in nature such as less than $100.00 per event.
We think it is also necessary to comment that public use of state facilities as outlined in the regulation appears to be consistent with the proposition discussed in the case ofWidmar v. Vincent, 454 U.S. 263, 70 L.Ed. 440,120 S. Ct. 269 (1981). In that case equal access of a religious group to a state university property which happened to be property of the University of Missouri at Kansas City was in question. The facilities were available for the activities of registered student groups. A registered religious group who once had permission was denied permission to use the property because it was "for purposes of religious worship or religious teaching".
In Widmar v. Vincent, supra, the United States Supreme Court said that the policy of the University of Missouri at Kansas City violated the fundamental principles of free speech. Having created the forum generally open for use by student groups, the University of Missouri at Kansas City in order to exclude from such forum based on religious content of the group's intended speech must satisfy the standards of review appropriate to content based exclusion. The regulations to be valid must serve a compelling state interest and be narrowly drawn. In that case the court stated "The Constitution forbids a state to enforce certain exclusions from a forum generally open to the public even if it was not required to create the forum in the first place." See page 267 of the opinion. The court also recognized that the University of Missouri at Kansas City had the capacity to establish reasonable restrictions as to time, place and manner of use of state property for the exercise of free speech. Thus the Office of Administration may establish reasonable restrictions on time, place and manner of use of state property.
We believe the answers to your questions in light of the above-cited state regulation and supporting United States Supreme Court cases appear quite obvious. The State of Missouri has traditionally offered access to political candidates to make announcements and to officeholders to make speeches on political issues whether that candidate or officeholder is a Democrat, Republican or from some other political persuasion. Certainly the University of Missouri property, as well as public parks and schools, have been used for political campaigns and activities in the past. The longstanding policy of the state of Missouri apparently is reflected in great measure in 1 CSR 30-4.020(5). Additionally use of public property has already been addressed in the cases cited above and is generally commented on in 78 C.J.S. Schools, Section 259(b)(2), also in 81(a) C.J.S. States, Section 146, Use of Public Property.
Finally, in further response to your question we have concluded that a state merit employee working for the Office of Administration is not prohibited from carrying out his ordinary duties as directed by the Office of Administration even though those duties may include maintaining state property for political activity under the regulation 1 CSR 30-4.020(5). Such activities could include the announcement of candidacy for public office or addressing a farm rally or as in the case of John Glenn, announcements concerning running for the Presidency of the United States. Consequently we find no abuse by state merit system employees and further find that they acted appropriately in the premises in protecting and maintaining state facilities consistent with the numerous United States Supreme Court cases.
Nothing we have said above should be construed to mean that any group can use state or local public property at any time without abiding by reasonable restrictions as to location, time, maintenance, and protection of the public property.
Very truly yours,
WILLIAM L. WEBSTER